UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                     :
GMA ACCESSORIES, INC.,                               :
                                                     :
                        Plaintiff,                   :
                                                     :           06 Civ. 6236 (GEL)
            -v-                                       :
                                          _____:_____
                                                                **OPINION AND ORDER**
CROSCILL, INC., LINENS N' THINGS, INC.,              :
BED, BATH & BEYOND INC., and                         :
BURLINGTON COAT FACTORY                              :
WAREHOUSE CORPORATION,                               :
                                                     :
                        Defendants.                  :
                                                     :
-----------------------------------------------------------------x

John P. Bostany, Andrew T. Sweeney, The Bostany
Law Firm, New York, NY, for plaintiff.

David Rabinowitz (Scott E. Silberfein, Joy Fallek,
of counsel), Moses & Singer LLP, New York, NY,
for defendants.

 GERARD E. LYNCH, District Judge:

        Plaintiff GMA Accessories, Inc. ("GMA") brings this action for trademark infringement,

trademark dilution, and related claims against Croscill, Inc. ("Croscill"), and retailers Linens n'

Things, Inc., Bed Bath & Beyond Inc., and Burlington Coat Factory Warehouse Corporation

(collectively, "the retailers"), who sell Croscill's products.  Prior to the completion of discovery,

GMA moved for a preliminary injunction and partial summary judgment on its trademark

infringement claim, as well as dismissal of defendants' counterclaims for attorneys' fees.  This

Court denied GMA's motion and noted that at that stage of the case "issues of fact abound[ed] as

to whether plaintiff can establish a violation of its trademarks."  GMA Accessories, Inc. v.

Croscill, Inc., No. 06 Civ. 6236, 2007 WL 766294, at *1 (S.D.N.Y. March 13, 2007).  Discovery

is now complete and defendants move for summary judgment on all claims, including their counterclaims for legal fees. The motion will be granted in part, and denied in part.

## BACKGROUND

The central dispute in this case concerns the parties' use of the word "Charlotte." GMA, which manufactures women's fashion items, began using "Charlotte" in commerce in 1996 and has registered the word as a trademark for certain categories of clothing and accessories, including scarves, gloves, socks, handbags, hats, hair clips, and sunglasses. (P. Rule 56.1 Stmt. ¶ 44; D. Rule 56.1 Stmt. ¶ 9.) Croscill, a manufacturer of window, bedding, and bathroom products, first used the word "Charlotte" in August 2003 to designate a style of window products, specifically "valance, panel, and other draperies." (D. Rule 56.1 Stmt. ¶ 2.) Croscill discontinued these items in early 2005 but, later that year, reused "Charlotte" for a line of coordinated bathroom products, including towels, shower curtains, toothbrush holders, a lotion pump, and a jar. (Id. ¶¶ 2-3.) Croscill claims that it selected the "Charlotte" name for both its window and bath products without any knowledge of GMA's use or registration of the "Charlotte" mark, and that its use of "Charlotte" was intended solely as a style name and not as a trademark indicating the source of its products. (Id. ¶¶ 2-4.) Croscill has sold its "Charlotte" bath products to all of the retailers in this action and continues to carry these items in its bath product line. (Id. ¶ 3.)

In addition to Croscill, several third parties, including Gatco, Inc. ("Gatco") and American Pacific Enterprises, LLC ("American Pacific"), have also sold items using the word "Charlotte" to some of the defendant retailers. (See Silberfein Reply Aff. ¶¶ 2, 3.) Specifically, in August 2002, Gatco began using "Charlotte" on its bathroom hardware products, which

include towel bars, towel rings, toilet paper holders, mirrors, and glass shelving.  (Rabinowitz Aff. Ex. I ("Bergman Dep."), at 18:14-20:5.)  Defendant Linens n' Things carried Gatco's "Charlotte" products from February 2003 until March 2007, when Gatco reached an agreement with GMA to phase out its use of "Charlotte."  (Id. ¶ 6; Raps Decl. Ex. 66.)  American Pacific similarly offered for sale certain bedding products under license from Liz Claiborne using the name "Charlotte," including bedspreads, comforters, drapery panels, duvets, pillows, shams, and valences.  (D. Rule 56.1 Stmt. ¶ 7.)  From December 2005 to the fourth quarter of 2006, defendants Bed, Bath & Beyond Inc. and Linens n' Things, Inc. carried American Pacific's "Charlotte" products in their stores.  (Id. ¶¶ 7-8.)  In November 2006, after receiving a cease and desist letter from GMA, American Pacific agreed to abstain from any further use of "Charlotte."  (Raps Decl. Exs. 63-64.)  Both Gatco and American Pacific claim that they chose "Charlotte" as a style name without any knowledge of GMA's use or registration of the "Charlotte" mark.  (D. Rule 56.1 Stmt. ¶¶ 5, 8.)

GMA alleges that Croscill's actions, as well as the retailers' sale of "Charlotte" items produced by Croscill, Gatco, American Pacific, and other third parties (see Silberfein Reply Aff. ¶¶ 2, 3),[1] have infringed and diluted its "Charlotte" mark.  GMA seeks injunctive relief and damages under the Lanham Act, 15 U.S.C. § 1051 et seq., and New York statutory and common law.  (Am. Compl. ¶¶ 49-91.)  Defendants, in turn, assert that GMA brought this action "without

---

[1] Although GMA does not allege that the defendant retailers were "involved with the manufacture of a product or the affixing of an infringing mark to a product," it is well established that a retailer's sale of a product bearing an infringing mark "is sufficient . . . for it to be liable for the results of such infringement and its claimed lack of knowledge of its supplier's infringement, even if true, provides no defense."  El Greco Leather Prod. Co v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986).

3

any reasonable basis to believe in liability against the defendants or injury to plaintiff," and seek to recover their attorneys' fees and expenses for defending this action. (D. Countercl. Mem. 1.)

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, summary judgment may be granted "[i]f the evidence is merely colorable, or is not significantly probative." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Id. at 248.

As a preliminary matter, GMA asserts that the arguments raised in the instant motion for summary judgment were already "judiciously determined" to be without merit in the Court's prior opinion. (P. Mem. 1.) That prior decision, however, denied *plaintiff*'s premature motion

4

for summary judgment, and although defendants suggested that the Court enter summary judgment in their favor, defendants never made a properly supported motion. See GMA Accessories, Inc., 2007 WL 766294, at *4 (noting that defendants have "not moved for summary judgment"). The Court's prior decision, moreover, was based on an incomplete record, and nothing in that decision precludes defendants from making a proper motion for summary judgment now based on a full evidentiary record. Accordingly, GMA's suggestion that the issues pertinent to this motion were already decided by the Court "the first time around" (P. Mem. 1) is unavailing. Accordingly, the Court turns to the merits of defendants' motion.

## II.     Trademark Infringement

GMA's Amended Complaint asserts trademark infringement and related claims under both the Lanham Act and New York common law. Specifically, Count I, as modified by the Court's May 8, 2007, Order (Doc. # 74) (dismissing trade dress infringement and counterfeiting claims), alleges trademark infringement in violation of 15 U.S.C. § 1114(1)(a). (Am. Compl. ¶ 55.) Count III alleges "unfair competition, false designation of origin, and false description or representation" in violation of 15 U.S.C. § 1125(a).[2] (Id. ¶ 66.) Count V alleges trademark infringement, unfair competition, and misappropriation in violation of New York common law. (Id. ¶ 78.) "It is well established that the elements necessary to prevail on causes of action for

---

[2] Section 1125(a) "prohibits similar conduct" to § 1114(1)(a), but "is not limited to the uses of registered trademarks." See Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 390 n.4 (2d Cir. 1995). The legal standards governing § 1114(1)(a) and § 1125(a) claims are identical. See id. at 390; Time, Inc. v. Petersen Pub. Co. L.L.C., 173 F.3d 113, 118 (2d Cir. 1999) (noting that the "test for infringement of a registered or unregistered trademark is the same").

trademark infringement and unfair competition under New York common law mirror the

Lanham Act claims." Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456

(S.D.N.Y. 2005) (internal quotation marks omitted).[3]

To prevail on a claim of trademark infringement under the Lanham Act, "the plaintiff

must prove that its mark is entitled to protection and, even more important, that the defendant's

use of its own mark will likely cause confusion with plaintiff's mark." Star Indus., Inc. v.

Bacardi & Co. Ltd., 412 F.3d 373, 381 (2d Cir. 2005). Defendants do not dispute that GMA's

"Charlotte" mark is a registered mark entitled to protection. Accordingly, the critical inquiry is

"whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are

likely to be misled, or indeed simply confused, as to the source of the goods in question." Savin

Corp. v. The Savin Group, 391 F.3d 439, 456 (2d Cir. 2004) (internal quotation marks omitted);

see New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 554 (2d

Cir. 2002) (noting that "plaintiff must show a probability, not just a possibility, of confusion").

A.      *Polaroid* Factors

Whether there is a likelihood of confusion is determined by applying the eight-factor test

established by Judge Friendly in Polaroid Corp. v. Polaroid Electronics Corp.:

> Where the products are different, the prior owner's chance of
> success is a function of many variables: the strength of his mark,
> the degree of similarity between the two marks, the proximity of
> the products, the likelihood that the prior owner will bridge the
> gap, actual confusion, and the reciprocal of defendant's good faith
> in adopting its own mark, the quality of defendant's product, and
> the sophistication of the buyers.

---

[3] "New York unfair competition law also requires a showing of actual confusion and bad
faith before monetary relief may be awarded." Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d
690, 702 (S.D.N.Y. 1999).

287 F.2d 492, 495 (2d Cir. 1961).  The Second Circuit has suggested that the first three <u>Polaroid</u>

factors — strength, similarity of marks, and proximity of products — are "perhaps the most

significant in determining the likelihood of confusion."  <u>Mobil Oil Corp. v. Pegasus Petroleum

Corp.</u>, 818 F.2d 254, 258 (2d Cir. 1987).  "Application of the <u>Polaroid</u> test is not mechanical,"

however, "and no one factor is necessarily dispositive, although any one factor may prove to be

so."  <u>New York Stock Exchange</u>, 293 F.3d at 555 (internal quotation marks omitted).  "If a

factual inference must be drawn to arrive at a particular finding on a <u>Polaroid</u> factor, and if a

reasonable trier of fact could reach a different conclusion, the district court may not properly

resolve that issue on summary judgment."  <u>Cadbury Beverages, Inc. v. Cott Corp.</u>, 73 F.3d 474,

478 (2d Cir. 1996).  Summary judgment is appropriate "where the undisputed evidence would

lead only to one conclusion as to whether confusion is likely."  <u>Id</u>.

>    1.    <u>Strength of Mark</u>

The strength of a trademark measures "its power to identify the source of a product."

<u>Time, Inc. v. Petersen Pub. Co. LLC</u>, 173 F.3d 113, 117 (2d Cir. 1999); <u>see</u> <u>Lang v. Ret. Living

Pub. Co.</u>, 949 F.2d 576, 581 (2d Cir. 1991) (noting that "the strength of the mark turns on its

origin-indicating quality[] in the eyes of the purchasing public" (internal quotation marks

omitted)).  A mark's strength is comprised of two components: "inherent distinctiveness and

acquired distinctiveness."  <u>Playtex Prods., Inc. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 163 (2d

Cir. 2004) (internal quotation marks omitted).

Inherent distinctiveness is measured on an ascending scale reflecting "not only eligibility

to trademark status but also the degree of protection accorded."  <u>TCPIP Holding Co., Inc. v.

Haar Communications, Inc.</u>, 244 F.3d 88, 93 (2d Cir. 2001) (internal quotation marks omitted).

The scale, progressing from least to most distinctive, ranges from: (1) generic marks that consist of words that merely "identify the type or species of goods" to which they apply; (2) descriptive marks that directly "describe a product or its qualities, ingredients or characteristics"; (3) suggestive marks that "do not directly describe goods . . . or their attributes, but rather are suggestive of them"; and (4) marks that are "arbitrary or fanciful in relation to the products" on which they are used. Playtex Prods., 390 F.3d at 163 (internal quotation marks omitted). Generic marks are "not at all distinctive and thus are not protectable under any circumstances." Star Indus., 412 F.3d at 385. Descriptive marks also are not inherently distinctive but are protectable when they acquire "secondary meaning."[4] Id. Suggestive, fanciful, and arbitrary marks are each inherently distinctive and thus entitled to protection without any proof of secondary meaning. Id. The placement of a mark on the spectrum of distinctiveness is a factual question, and "the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999).

In their moving brief, defendants assert that GMA's "Charlotte" mark is "suggestive of girls' and women's products" (D. Mem. 16), but defendants change course in their reply brief, arguing that GMA's mark is merely descriptive because the "Charlotte" mark was named after the daughter of GMA's president, and "personal names used as marks are uniformly classed as

---

[4] "A trademark acquires secondary meaning when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Cadbury Beverages, 73 F.3d at 479 n.3 (internal quotation marks omitted); see Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (noting that secondary meaning exists where "the public is moved in any degree to buy an article because of its source").

descriptive" (D. Reply Mem. 5). GMA, in contrast, claims that its "Charlotte" mark is arbitrary because it is "not commonly associated with the products marketed by GMA nor does it identify a particular individual associated with GMA." (P. Mem. 6.)

Although "personal names — both surnames and first names — are generally regarded as descriptive terms," 815 Tonawanda Street Corp. v. Fay's Drug Co., Inc., 842 F.2d 643, 648 (2d Cir. 1988), this generalization "does not apply if the public is unlikely to understand the [mark] as a personal name," Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 990 (7th Cir. 2004), citing Lane Capital Mgmt, 192 F.3d at 345-46. While GMA admits that its "Charlotte" mark was in fact named after the daughter of GMA's president (see Rabinowitz Aff. Ex. V ("Altirs Dep."), at 49:8-17), defendants have adduced no evidence from which a factfinder could reasonably conclude that *consumers* would likely perceive the mark as a personal name. See 2 McCarthy on Trademarks and Unfair Competition § 13:2, at 13-6.1 (4th ed. 2007) (hereinafter "McCarthy") (noting that "[t]he key is whether the public will likely perceive the term as a personal name"). Indeed, the word "Charlotte" has several dictionary meanings, including a type of dessert and the name of a major city in North Carolina.[5] In the context of GMA's products, moreover, rather than conveying any "descriptive impression" that a particular individual named Charlotte is or was associated with GMA, 815 Tonawanda Street, 842 F.2d at 648, GMA's use of the common

---

[5] Webster's Third New International Dictionary defines "charlotte" as:

> (1) a dessert made by lining a dish with strips of bread, cake, or ladyfingers and filling it with fruit, whipped cream, custard or other filling; (2) of or from the city of Charlotte, N.C.; of the kind or style prevalent in Charlotte.

Webster's Third New International Dictionary 378 (1993).

female name "Charlotte" is clearly suggestive of the women's fashion items and accessories it sells under that mark.  See Time, 173 F.3d at 118 (observing that suggestive marks require "imagination, thought and perception to reach a conclusion as to the nature of goods" (internal quotation marks omitted)); Peaceable Planet, 362 F.3d at 990 (finding that the name "'Niles,' at least when affixed to a toy camel, is a suggestive mark").  For this reason, GMA's contention that its mark is arbitrary is also without merit.  See 2 McCarthy § 11:11, at 11-18 (observing that arbitrary marks comprise only those words "that are in common linguistic use but which, when used with the goods . . . in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods").

    Although GMA's "Charlotte" mark is suggestive, and thus possesses a moderate degree of inherent distinctiveness, the record is utterly devoid of any evidence of acquired distinctiveness.  Indeed, despite the Court's observation in its prior opinion that GMA had "presented no evidence regarding consumer recognition of the mark," GMA Accessories, Inc., 2007 WL 766294, at *2, GMA has failed to remedy this evidentiary defect as the record still contains no affirmative evidence of marketplace recognition.  GMA nevertheless argues that marketplace recognition can be inferred from its continuous use of the "Charlotte" mark since 1996, its sale of $13.6 million worth of "Charlotte" products during the five-year period from 2002-2006, and its "considerable" expenditures on advertising.  (P. Mem. 7-9; Maloof Decl. ¶ 3.) As defendants point out, however, the extensive and prior use of the word "Charlotte" by numerous third parties significantly undercuts GMA's claim of strength.  In particular, Charlotte Russe Merchandising, a national retailer whose annual sales are hundreds of times larger than those of GMA, began using its "Charlotte Russe" mark on women's fashion items and

accessories almost twenty years prior to GMA's first use of its "Charlotte" mark. (Murphy Aff. ¶¶ 4-6.) See Time, 173 F.3d at 118 ("The use of part or all of the mark by third parties weakens its overall strength."). Moreover, although the record contains numerous examples of GMA's promotional activity, GMA admittedly cannot calculate with any specificity the amount it has spent on advertising for "Charlotte." The only quantifiable evidence in the record reflecting advertising on "Charlotte" goods amounts to less than $17,000 for the entire life of the mark.[6] (D. Rule 56.1 Stmt. ¶ 27.) Such "meager promotional expenditures" weigh against a finding of acquired distinctiveness. H. Lubovsky, Inc v. Esprit de Corp., 627 F. Supp. 483, 487 (S.D.N.Y. 1986).

In sum, while GMA's "Charlotte" mark is suggestive of its women's fashion items and accessories, the lack of evidence establishing any commercial recognition of the mark means that, as a matter of law, "Charlotte" is a "relatively weak mark[] in the place where it counts: the marketplace." 2 McCarthy 11:83, at 11-186-11-187.

### 2. Similarity of Marks

In assessing the similarity of two word marks, courts begin by examining their text, typeface, and general appearance. See Cadbury Beverages, 73 F.3d at 480; Lang, 949 F.2d at 582. "An inquiry into the degree of similarity between two marks," however, "does not end with a comparison of the marks themselves." Savin Corp., 391 F.3d at 458 (internal quotation marks omitted). Indeed, courts analyze "the overall impression created by the [marks] and the context

---

[6] Although GMA claims that it spent nearly $500,000 in showroom expenses specifically for showcasing "Charlotte" goods (P. Mem. 9), defendants correctly note that this figure simply consists of rent on a showroom into which no consumer is claimed to have ventured, rather than advertising or promotional expenses directed to consumers (D. Reply Mem. 5 n.4).

in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Gruner + Jahr USA Publishing v. Meredith Corp., 991 F.2d 1072, 1078 (2d Cir. 1993). In particular, the presence of a "distinct brand name" appearing alongside the mark may "weigh against a finding of confusing similarity." Playtex Prods., 390 F.3d at 164.

As the Court noted in its prior opinion, the similarity factor appears at first glance to weigh in GMA's favor as the mark is registered as a word mark, and the parties use the identical word "Charlotte." "[E]ven close similarity between two marks," however, "is not dispositive of the issue of likelihood of confusion." Savin Corp., 391 F.3d at 458 (internal quotation marks omitted). Here, the stylized, lower-case script used by GMA differs significantly from the typeface used by Croscill, Gatco, and American Pacific.[7] (Compare Raps Decl. Exs. 6, 10, 42, 43, 48 with Sweeney Decl. Exs. E-H and Rabinowitz Aff. Ex. SS.) GMA also places the "Charlotte" mark on its products through hangtags or labels prominently attached to GMA merchandise (see, e.g., Raps Decl. Exs. 46, 48), while Croscill's use of "Charlotte" is somewhat less conspicuous, appearing on bar code labels or in small type on hangtags (see Sweeney Decl. Ex. H; Dupont Aff. ¶ 5). In their promotional materials, moreover, both GMA and Croscill often present their respective brand names in tandem with "Charlotte." (See Raps Decl. Exs. 1, 6, 10, 25, 41, 42, 43; Sweeney Decl. Exs. E, G.) These differences in the parties' presentation and placement of "Charlotte" are sufficient to raise genuine factual questions regarding whether consumers even perceive "Charlotte" as a designator of origin (as opposed to simply a style

---

[7] Although the record contains one isolated example of GMA using block lettering for "Charlotte" similar to a typeface sometimes used by Croscill (compare Raps Decl. Ex. 46 with Sweeney Decl. Exs. G, H), virtually all of the other examples in the record depict GMA's "Charlotte" mark in a stylized, lower-case script.

name),[8] and if so, to what extent (if any) consumers view the parties' varying depictions of "Charlotte" as confusingly similar. Accordingly, the existence of these factual questions precludes resolution of this <u>Polaroid</u> factor in favor of either GMA or defendants.

3.     <u>Proximity of Products</u> and
4.     <u>Bridging the Gap</u>

The proximity of products inquiry concerns "whether and to what extent the two products compete with each other." <u>Cadbury Beverages</u>, 73 F.3d at 480. In assessing this factor, courts consider "the nature of the products themselves and the structure of the relevant market." <u>Id</u>. (internal quotation marks omitted). If the products "serve the same purpose, fall within the same general class or are used together, the use of similar designations is more likely to cause confusion." <u>Lang</u>, 949 F.2d at 582. Where the goods are not directly competitive, moreover, courts also examine the related <u>Polaroid</u> factor of "bridging the gap," which "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." <u>Star Indus</u>., 412 F.3d at 387.

Defendants contend that their "Charlotte" products are not competitive with GMA's "Charlotte" goods because GMA has never used its "Charlotte" mark on any window or bathroom products. (D. Mem. 18.) As GMA correctly contends, however, it has used the "Charlotte" mark on at least one product, bathrobes, that is closely related to at least one of Croscill's bath products, towels. Given the products' functional similarity, and the evidence that both GMA's and Croscill's products are sold in some of the same stores (<u>see</u>, <u>e.g.</u>, Altirs Dep.

---

[8] <u>See</u> 2 McCarthy 11:36, at 11-88 ("[W]ords . . . used as designations of a particular style . . . [are] not valid trademarks if they do not serve the function of identifying and distinguishing the goods . . . of this seller from those of others.").

210:10-15), a consumer shopping for bath products could very well come across both GMA's "Charlotte" bathrobe and Croscill's "Charlotte" towel at the same or similar retail locations.[9] See Star Indus., 412 F.3d at 386 (noting that even if products are "never sold in the same stores," products may still "be in competitive proximity" where, *inter alia*, "products appealed to the same consumers" and "consumers who visited stores selling the one product were reasonably likely to visit nearby retail stores where the other was sold" (internal quotation marks and alterations omitted)). GMA's "Charlotte" bathrobes and Croscill's "Charlotte" towels, then, are clearly in close competitive proximity, and the same retailers' sale of both products undeniably increases the probability that consumers will mistakenly think that the goods come from the same source.

The competitive proximity of the parties' other products, however, is not so clear. On the one hand, the types of women's apparel and fashion accessories produced by GMA are typically sold in different stores or in different departments of large stores than the window or bath accessories manufactured by Croscill or Gatco. As the Court noted in its prior opinion, however, "it is hardly uncommon for the same designers or manufacturers to market both clothing and home decor items,"[10] GMA Accessories, Inc., 2007 WL 766294, at *2, and neither party has adduced sufficient evidence to persuade the Court that a reasonable factfinder could reach only

---

[9] For example, a representative of defendant Linens N' Things testified that Croscill's "Charlotte" towels were stocked in the "Bath Accessory" department while bathrobes and other towels were stocked in the adjacent "Towel" department. (Sweeney Decl. Ex. I ("Nagy Dep."), at 49:15-51:17.)

[10] See, e.g., Rabinowitz Decl. Ex. K ("Hamm. Dep."), at 11:14-21 (describing Liz Claiborne bedding products); Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 661 (5th Cir. 2000) (noting that "Polo Ralph Lauren . . . sells wearing apparel, accessories, home furnishings, and fragrances").

one conclusion regarding the competitive proximity of the products at issue.

The Court similarly adheres to its conclusion that factfinders could reasonably differ as to whether defendants' home decor products lie within GMA's "zone of natural business expansion." Id. Defendants argue that it is unlikely that GMA will bridge the gap as GMA has not produced any business plans or filed any documents with the United States Patent and Trademark Office evidencing any intent to use "Charlotte" on any of the types of home decor products manufactured or sold by defendants. (D. Mem. 20-21.) The "absence of a present intent to bridge the gap," however, "is not determinative" and "the assumptions of the typical consumer" also "must be taken into account." Cadbury Beverages, 73 F.3d at 482 (internal quotation marks omitted). GMA's president testified that GMA had sold certain bath accessories in the past, including soap dishes, soap dispensers, shower curtains, bathroom rugs, lotion pumps, and toothbrush holders.[11] (Altirs Dep. 101:3-12, 107:25-109:21). Given this testimony, it is plausible that a typical consumer, upon seeing defendants' "Charlotte" bath products, would assume that GMA had *already* bridged the gap and re-entered the market for bath accessories. But whether "consumers would perceive a gap at all, or would assume that any gap has already been bridged," depends on questions of fact that cannot be resolved at this stage of the litigation, including whether typical consumers would know that GMA had previously sold bathroom accessories and was now selling fashion items under the "Charlotte" mark, and whether such consumers would associate defendants' use of "Charlotte" on their bath products with GMA's

---

[11] GMA's president could not recall whether these bath accessories were sold under the "Charlotte" mark, and nothing in the record indicates that they were sold under that mark. (Altirs. Dep. 101:16-18, 107:25-109:21; see Sweeney Decl. ¶ 9.)

mark.[12] Cadbury Beverages, 73 F.3d at 482.

In sum, although at least one of GMA's products is clearly in close competitive proximity to one of defendants' products, significant factual questions remain regarding both the extent to which the parties' other products compete, and whether GMA is likely to enter (or is perceived by consumers as likely to enter or to have re-entered) the market for defendants' products. Accordingly, with regard to both the proximity of products and bridging the gap factors, sufficient factual disputes exist that preclude resolution of these factors as a matter of law in favor of either GMA or defendants.

### 5. Actual Confusion

Although "actual confusion need not be shown to prevail under the Lanham Act," Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986), "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion,"

_____

[12] GMA also claims that it owns an unregistered mark in "Charlotte" in the "home goods class," and that there is no gap to bridge because its home goods products (e.g., pillows, blankets, etc.) are directly competitive with defendants' products. (P. Mem. 1, 14.) Even assuming arguendo that the "home goods" category is a sufficiently narrow class for purposes of trademark protection, see 4 McCarthy § 24:46, at 24-99 (noting trademark owner's incentive to use broad "semantic labels" in defining class of goods), defendants correctly assert that GMA did not record substantial sales of any "Charlotte" home goods products "until after every one of defendants' products were already in the market." (D. Mem. 20.) Although GMA did sell $8,100 worth of "throws" under the name "Charlotte Home" in June 2005, which predated Croscill's and American Pacific's sale of their "Charlotte" goods in late 2005, GMA did not make another sale of "Charlotte" adult home products until February 2006 (consisting of $53,662 in throws), and then not again until April 2006, when it sold throws and "faux fur pillows" to one customer. (D. Rule 56.1 Stmt. ¶ 52.) Viewed in this context, GMA's isolated sale of throws in June 2005 was merely "casual and transitory" and thus insufficient to establish trademark rights in "Charlotte" for home goods. Major League Baseball Properties, Inc. v. Opening Day Productions, Inc., 385 F. Supp. 2d 256, 266 (S.D.N.Y. 2005) (internal quotation marks omitted); see ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 146 (2d Cir. 2007) (noting that "trademark rights flow from priority and that priority is acquired through use").

Savin Corp., 391 F.3d at 459. Despite the obvious importance of this Polaroid factor and the Court's prior observation that GMA had "presented no evidence whatsoever of any actual confusion between plaintiff's and defendants' products," GMA Accessories, Inc., 2007 WL 766294, at *3, GMA has done nothing to fill this evidentiary gap. Defendants, in contrast, commissioned a survey of 200 potential purchasers of their "Charlotte" products, which "documented a total absence of consumer confusion." (Dupont Reply Aff. ¶ 15.) Although GMA argues that the survey contains several methodological flaws, its objections are convincingly refuted in a reply affidavit filed by defendants' expert, Thomas D. Dupont, who designed and supervised the survey. (See id. ¶¶ 16-25.) In particular, Dupont explains that his survey utilized the "Eveready" procedure (id. ¶ 9), which has been approved by courts and described by a leading commentator as "a now-standard survey format used to prove likely confusion where plaintiff makes some products which defendant does not." 6 McCarthy 32:174, at 32-354; see, e.g., Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 483 (S.D.N.Y. 2002) (approving Eveready style of survey), citing Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366 (7th Cir. 1976). The lack of any consumer confusion reported in Dupont's survey, coupled with GMA's failure to perform its own consumer survey, see Nikon, Inc. v. Ikon Corp., 803 F. Supp. 910, 922 (S.D.N.Y. 1992) (noting that plaintiff's "failure to undertake a consumer survey to demonstrate actual confusion" favors defendant), or adduce any other evidence of actual confusion, clearly tip this Polaroid factor in defendants' favor.

6.    Good Faith

_____The good faith inquiry "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between

17

his and the senior user's product." Savin Corp., 391 F.3d at 460 (internal quotation marks and alterations omitted). In this case, GMA's sole basis for claiming that defendants acted in bad faith is Croscill's failure to perform a trademark search prior to adopting the "Charlotte" name. (P. Mem. 18-19.) "[F]ailure to perform an official trademark search," however, "does not, standing alone, prove that Defendants acted in bad faith." Savin Corp., 391 F.3d at 460 (internal quotation marks and alterations omitted). Although Croscill's failure to undertake a trademark search could support an inference of bad faith, a reasonable factfinder could also conclude that Croscill acted in good faith given the lack of any evidence that Croscill possessed any actual knowledge of GMA or its "Charlotte" mark prior to adopting the "Charlotte" name. (Rabinowitz Aff. Ex. K ("Cassella Dep."), at 38:16-42:23.) Indeed, the Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search." Star Indus., 412 F.3d at 388. Nevertheless, because the issue of defendants' good faith ultimately turns on the credibility of defendants' witnesses and the inferences to be drawn from their testimony, the Court declines to hold as a matter of law that this Polaroid factor favors either GMA or defendants. See American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 353 (2d Cir. 1981) ("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment.").

### 7. Quality of Defendants' Products

The quality factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Star Indus., 412 F.3d at 389 (internal quotation marks omitted). Defendants correctly assert that GMA has produced no evidence whatsoever that defendants' products are of inferior quality.

Indeed, GMA does not even allege that defendants' products are inferior. Accordingly, this Polaroid factor weights in favor of defendants as a matter of law.

### 8. Sophistication of Consumers

"The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." Cadbury Beverages, 73 F.3d at 480 (internal quotation marks omitted). "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." TCPIP Holding, 244 F.3d at 102. Neither GMA nor defendants have submitted any "direct evidence" of consumer sophistication, "such as expert opinions or surveys." Star Indus., 412 F.3d at 390. Indeed, GMA makes no claim at all about the sophistication of its consumers, and while defendants suggest plausible inferences of sophistication based on the price and "highly stylized" nature of their goods (D. Mem. 27), a reasonable factfinder would not be compelled to accept those inferences. See GMA Accessories, Inc., 2007 WL 766294, at *3. Accordingly, resolution of this Polaroid factor must await a jury at trial.

### B. *Polaroid* Balancing

Having carefully considered each of the Polaroid factors, the Court concludes that three of the factors, strength of mark, actual confusion, and quality of defendants' products, favor defendants as a matter of law. With regard to the remaining five factors, however — including two of the "most significant" factors, Mobil Oil Corp., 818 F.2d at 258, similarity of marks and proximity of products — the existence of numerous issues of material fact precludes the Court from conclusively determining whether a likelihood of confusion exists. See Cadbury, 73 F.3d at 479. Accordingly, because the "heart of a successful claim based upon . . . [both] the Lanham

Act . . . and common law trademark infringement is the showing of likelihood of confusion as to the source or sponsorship of defendant's products," <u>Standard & Poor's Corp.</u>, 683 F.2d at 708, defendants' motion for summary judgment on GMA's trademark infringement and related claims under both the Lanham Act and New York common law must be denied.

## III.  Trademark Dilution

### A.  <u>Federal Dilution Claim</u>

Count II of the Amended Complaint alleges that defendants "caused dilution of the distinctive quality" of GMA's "Charlotte" mark in violation of federal law.  (Am. Compl. ¶ 65.) The Trademark Dilution Revision Act of 1996 ("TDRA"), which replaced the Federal Trademark Dilution Act of 1996 ("FTDA"),[13] provides:

> the owner of a *famous* mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become *famous*, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or

---

[13] Among other changes, the TDRA established a "likelihood of dilution" standard for dilution claims (rather than an "actual dilution" standard under the FTDA) and extended protection against dilution to non-inherently distinctive marks that have acquired distinctiveness (whereas the FTDA protected only inherently distinctive marks).  <u>Dan-Foam A/S v. Brand Named Beds, LLC</u>, 500 F. Supp. 2d 296, 306 n.87 (S.D.N.Y. 2007) (describing TDRA's modifications to federal anti-dilution law).  In addition to injunctive relief, the TDRA also permits recovery of damages, but only if the mark "that is likely to cause dilution . . . was first used in commerce by the person against whom the injunction is sought after October 6, 2006." 15 U.S.C. § 1125(c)(5)(A).  It is undisputed that all of the defendants began using "Charlotte" prior to October 6, 2006.  Accordingly, only GMA's claim for injunctive relief is governed by the TDRA, <u>see</u> <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 477 F.3d 765, 766 (2d Cir. 2007), while GMA's claim for damages remains governed by the FTDA's standards, <u>see</u> <u>Malletier v. Dooney & Bourke, Inc.</u>, No. 04 Civ. 2990, 2007 WL 1222589, at *3-4 (S.D.N.Y. April 24, 2007).  In this case, the distinctions between the TDRA and FTDA are of little practical import because, as discussed below, GMA's "Charlotte" mark is not sufficiently famous to qualify for protection under either statute.  <u>See</u> <u>Dan-Foam A/S</u>, 500 F. Supp. 2d at 307 n.90 (noting that the FTDA's fame requirement "remains unchanged" by the TDRA).

absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (emphasis added).  As the Second Circuit has emphasized, "the element of fame is the key ingredient" because, "among the various prerequisites to [a dilution] claim, the one that most narrows the universe of potentially successful claims is the requirement that the senior mark be truly famous before a court will afford the owner of the mark the vast protections" of the TDRA.  Savin Corp., 391 F.3d at 449.

To satisfy the TDRA's fame requirement, a trademark owner must demonstrate that the mark is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A). The statute sets forth four non-exclusive factors to consider in "determining whether a mark possesses the requisite degree of recognition":

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.

As discussed above, although GMA claims that it has spent "considerable" amounts on advertising for "Charlotte" (P. Mem. 7-9; Maloof Decl. ¶ 3), GMA cannot calculate its promotional expenditures with any specificity or detail, and the only quantifiable evidence in the record reflects a mere $17,000 in advertising for "Charlotte" over the entire eleven-year life of

21

the mark.  GMA's sales revenue, moreover, averages less than $3 million per year, a figure

dwarfed by the $680 million in annual sales recorded by third party Charlotte Russe

Merchandising, which uses the "Charlotte Russe" mark on apparel items in direct competition

with GMA's products.  (Murphy Aff. ¶¶ 4-6.)  The record also contains no evidence of any

consumer recognition of GMA's mark, and the Dupont survey suggests that "actual recognition

of the mark is nil."  (D. Mem. 29.)  Finally, although GMA has registered its mark, defendants

point out that there are over 100 other registrations that also include or consist of the word

"Charlotte," thus showing that GMA's "Charlotte" hardly stands out.  (Murphy Aff. ¶ 3.)

It is patently clear from these considerations that GMA's "Charlotte" mark is not

sufficiently famous to qualify for protection under the TDRA.  See TCPIP Holding, 244 F.3d at

100 (noting that "Dupont, Buick, or Kodak" exemplify famous marks entitled to protection).

Accordingly, GMA's claim of trademark dilution under the TDRA must be dismissed.

### B.    New York State Dilution Claim

Count IV of the Amended Complaint asserts a claim of trademark dilution under the New

York State anti-dilution statute, N.Y. Gen. Bus. Law § 360-l,[14] which "provides more protection

against dilution" than does the TDRA.  SMJ Group, Inc. v. 417 Lafayette Restaurant LLC, 439

F. Supp. 2d 281, 292 (S.D.N.Y. 2006).  To prevail on a § 360-l claim, a plaintiff must show,

---

[14] N.Y. Gen. Bus. Law § 360-l provides that "[l]ikelihood of injury to business reputation
or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive
relief in cases of infringement of a mark registered or not registered or in cases of unfair
competition, notwithstanding the absence of competition between the parties or the absence of
confusion as to the source of goods or services."  The Second Circuit has cautioned that "it is not
clear that [N.Y. Gen. Bus. Law § 360-1] is coextensive with the [TDRA]."  Starbucks Corp., 477
F.3d at 766.

*inter alia*, that it possesses a "truly distinctive" trademark, which entails "look[ing] to the same factors that are examined when assessing the strength of a mark in the context" of a trademark infringement claim. <u>Strange Music, Inc. v. Strange Music, Inc.</u>, 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004) (internal quotation marks omitted); <u>see</u> <u>Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.</u>, 875 F.2d 1026, 1030 (2d Cir. 1989) ("Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."). The Second Circuit has held that § 360-l "protects only extremely strong marks." <u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1049 (2d Cir. 1992) (internal quotation marks omitted). "While this does not mean that the mark must be famous, weak marks will not be subject to a dilution claim under this statute." <u>Strange Music</u>, 326 F. Supp. 2d at 496.

As explained above, GMA's "Charlotte" mark is suggestive and thus possesses a moderate degree of inherent distinctiveness, but the total lack of any evidence of commercial recognition of the mark demonstrates that it is a "relatively weak mark[] in the place where it counts: the marketplace." 2 McCarthy 11:83, at 11-186-11-187. Accordingly, because GMA's "Charlotte" is not an "extremely strong" mark entitled to protection under § 360-1, <u>Bristol-Myers Squibb</u>, 973 F.2d at 1049, GMA's dilution claim under that statute must be dismissed.

## IV. Defendants' Counterclaims

As noted in the Court's prior opinion, defendants' counterclaims "amount to nothing more nor less than a demand that plaintiff pay defendants' legal fees incurred in defending this case." <u>GMA Accessories</u>, 2007 WL 766294, at *4. The Second Circuit has expressly stated that the Lanham Act allows recovery of a reasonable attorney's fee only on "evidence of fraud or bad

faith." Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996) (internal quotation marks omitted); see 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").  In addition, the Court may also award attorney's fees based on its inherent equitable powers, but only when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Baker v. Health Mgmt. Sys., Inc., 264 F.3d 144, 149 (2d Cir. 2001) (internal quotation marks omitted).

Defendants contend that they are entitled to payment of their attorneys' fees because GMA filed its complaint without an investigation of, and without any reasonable basis for, its claims.  (D. Countercl. Mem. 1.)  GMA is clearly a litigious plaintiff with a history of initiating multiple proceedings in both the federal courts and the Patent and Trademark Office.  In this case, however, an award for attorneys' fees is not justified.  Although GMA's complaint contains a number of factual inaccuracies and baseless allegations (see, e.g., May 8, 2007, Order (Doc. # 74) (dismissing trade dress infringement and counterfeiting claims)), it is, perhaps unfortunately, not uncommon for a plaintiffs to make exaggerated or overly zealous claims in their complaint, only to see them pared back as the litigation proceeds.  Although egregious examples of such conduct must be sanctioned, see, e.g., New Sensor Corp. v. CE Distribution LLC, 367 F. Supp. 2d 283, 288 (E.D.N.Y. 2005) (awarding fees where plaintiff "knew or should have known that its claims were not well grounded in fact" and noting that "one can only speculate about the motives which prompted its suit"); Diamond Supply Co. v. Prudential Paper Prods., 589 F. Supp. 470, 476 (S.D.N.Y. 1984) (observing that plaintiff's pursuit of "patently baseless" action presents "exceptional case" justifying award of fees under Lanham Act), the allegations in GMA's complaint, taken as a whole, are not so baseless or meritless as to give rise

to an inference of bad faith. Indeed, with regard to its trademark infringement claims, GMA has even adduced sufficient evidence to survive summary judgment and reach a jury.

While plaintiff's trademark claims seem notably weak, and defendants may very well achieve a complete victory at trial, the Court cannot conclude as a matter of law that GMA filed this action in bad faith. Accordingly, defendants' motion for summary judgment on their counterclaims for attorneys' fees is denied.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to plaintiff's federal and New York State dilution claims (Counts II and IV), and denied as to all other claims.

SO ORDERED.

Dated: New York, New York
    March 3, 2008

GERARD E. LYNCH
United States District Judge